IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | | |
|---|---|---|---|
| KENNETH J. COOKE, | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | Civil Action No. 4:13-cv-00018 | |
| | ) | | |
| CAROLYN W. COLVIN, | ) | | |
| Acting Commissioner of Social Security, | ) | By: | Joel C. Hoppe |
| Defendant. | ) | | United States Magistrate Judge |

## <u>REPORT AND RECOMMENDATION</u>

Plaintiff Kenneth J. Cooke seeks review of the Commissioner of Social Security's

("Commissioner") final decision denying his application for disability insurance benefits

("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security

Act, 42 U.S.C. §§ 401–434, 1381–1383f. On appeal, Cooke argues that the Commissioner erred

in giving the opinion of his treating psychiatrist little weight. Cooke also argues that the

Administrative Law Judge ("ALJ") improperly assessed his credibility. This Court has

jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), and this case is before the

undersigned magistrate judge by referral under 28 U.S.C. § 636(b)(1)(B). After carefully

reviewing the administrative record, the parties' briefs, and the applicable law, I find that the

ALJ's decision is supported by substantial evidence, and I recommend that the Commissioner's

decision be affirmed.

## I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

determination that a person is not entitled to disability benefits. *See* 42 U.S.C. §§ 405(g),

1383(c)(3); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role,

however, is limited—it may not "reweigh conflicting evidence, make credibility determinations,

1

or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court asks only whether the ALJ applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence," *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951). Ultimately, this Court must affirm the ALJ's factual findings if "'conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled.'" *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal quotation marks omitted)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a) (governing claims for DIB), 416.905(a) (governing adult claims for SSI). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant: (1) is working; (2) has a severe impairment; (3) has an

impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983). The applicant bears the burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II. Procedural History

Cooke was born on December 5, 1977 (Administrative Record, hereinafter "R." 179), and at the time of the ALJ's decision was considered a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). He is a high school graduate (R. 217) and has prior work history as a laborer, assembler, salesperson, factory technician, and retail worker (R. 218, 241). Cooke applied for DIB on October 18, 2010 (R. 179-80), and for SSI on November 2, 2010 (R. 183-92). He alleged a disability onset date of September 1, 2009, due to bipolar disorder, depression, chronic pain, muscle spasms and stiffness, fatigue, shortness of breath, kidney problems, confusion, memory loss, heart problems, and high blood pressure. (R. 179, 183, 216.)

The Commissioner rejected Cooke's applications initially and on reconsideration. (R. 17.) On January 3, 2012, the ALJ held an administrative hearing at which Cooke was represented by counsel. (R. 34-68.) In an opinion dated January 20, 2012, the ALJ found that Cooke had respiratory disorder, essential hypertension, vertebrogenic disorder, obesity, anxiety disorder, affective disorder, bipolar disorder, depressive disorder, and substance abuse disorder, which qualify as severe impairments. (R. 19.) None of the impairments met or equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 21-23.) The ALJ found that Cooke had the residual functional capacity ("RFC") to perform less than a full range of light

3

work,[1] and he can occasionally climb ramps or stairs, stoop, kneel, crouch, and crawl; can never climb ladders, ropes, or scaffolds; can no more than frequently balance; and must avoid concentrated exposure to heat, wetness, humidity, vibrations, irritants, and workplace hazards. (R. 23.) Additionally, his work must be limited to simple, routine, and repetitive tasks with only occasional interaction with supervisors. (*Id.*) Relying on the testimony of a vocational expert, the ALJ determined that Cooke was capable of performing his past work as an assembler. (R. 27.) The ALJ also made an alternate finding that Cooke could perform other work at both the light and sedentary levels. (R. 28.) Accordingly, the ALJ determined that Cooke was not disabled under the Act. (R. 29.) The Appeals Council denied Cooke's request for review (R. 1-5), and this appeal followed.

### III. Statement of Facts

*A.     Medical Evidence*

On November 30, 2009, Cooke complained of knee, neck, and wrist pain to Amy Branson, a physician's assistant. (R. 338). Branson's physical exam of these three areas revealed full ranges of motion and otherwise normal signs. (R. 338-39.) She also noted that Cooke was alert and oriented times three, and he had appropriate speech and affect. (R. 338.) On January 26, 2010, Cooke complained of joint and back pain and fatigue. (R. 343.) Branson noted seven tender points in Cooke's back, shoulder, and hips, but made no other physical findings. (R. 344.) Cooke reported no psychological symptoms, and Branson found normal psychological signs. (R. 343-44.)

---

[1] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, he or she also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b).

4

On June 25, 2010, Cooke was admitted under a temporary detention order to Community Memorial Hospital after stating that he would kill himself if he could not get relief from his chronic pain. (R. 305.) Dr. Masoud Hejazi, M.D., found that Cooke's memory in the recent and short term was good, his speech was coherent and appropriate with no looseness of association, his affect and mood were subdued and depressed, he was oriented to time, place, person, and situation, his fund of knowledge was fair, and he did not seem acutely psychotic, suicidal, or homicidal. (R. 306.) On June 28, a different attending physician found that Cooke did not remember the events of the two days preceding his hospitalization, a condition the physician attributed to Cooke's abuse of cocaine. (R. 307-08.) Although Cooke denied current drug use, his urine screen was positive for cocaine. (R. 307, 310.) He admitted to using heroin, cocaine, crack, and marijuana in the past. (R. 305, 310.) Dr. Veeraindar Goli, M.D., diagnosed opiate dependence; major depressive disorder, recurrent, moderate, severe; and cocaine abuse, and he opined that Cooke's prognosis was guarded. (R. 310, 313.) Upon discharge on July 2, Cooke's Global Assessment of Functioning ("GAF")[2] score was 65 to 70,[3] but it had been 25 to 50[4] upon

---

[2] GAF scores represent a "clinician's judgment of the individual's overall level of functioning." Am. Psychological Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed. 2000) ("*DSM-IV*"). The scale is divided into 10 ten-point ranges reflecting different levels of functioning, with 1–10 being the lowest and 91–100 the highest. *Id.*

[3] A GAF score of 61–70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household) but generally functioning pretty well, has some meaningful interpersonal relationships." *DSM-IV* 34.

[4] A GAF score of 21–30 indicates "behavior [that] is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends). " *DSM-IV* 34. A GAF score of 31–40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids

5

admission. (R. 310.) Cooke was prescribed various medications, including Wellbutrin, Prolixin, Depakote, and Effexor and instructed to follow-up with the community services board. (R. 313.)

On July 5, 2010, Cooke was admitted to the Center for Behavioral Health on a temporary detention order after he threatened his father and step-mother with a knife and then threatened to kill himself. (R. 321.) Cooke did not remember these events. (*Id.*) He denied suicidal intent and stated that he was upset because his pain prevented him from holding a job and he suspected he had lung cancer. (*Id.*) At intake, Cooke reported experiencing hallucinations and thoughts of suicide, which he later denied. (R. 321-22, 324.) Cooke also reported depressed mood, decreased energy and interests, and anxiety symptoms. (R. 322.) He admitted using cocaine two weeks ago and otherwise intermittently. (R. 321.) He also admitted using Percocet that he obtained from a street dealer, but his urine screen was positive only for tricyclics (antidepressants). (R. 321, 329.) Dr. Charlotte Hagan, M.D., noted that Cooke was drowsy, but could become alert. (R. 324.) She also noted that his mood was depressed, affect was flat, and memory, judgment, and insight were impaired. (*Id.*) His thought process showed amnesia for events leading up to his admission, his impulse control was intact although recently impaired, and his reliability was fair to poor. (*Id.*) She noted Cooke's history of polysubstance abuse. (R. 322.) His treatment plan involved group, individual, and milieu therapies and medication management. (R. 326.) During his admission, Cooke completed a Beck Depression Inventory[5] that indicated severe depression based on his

---

friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and failing in school)." *DSM-IV* 34.
A GAF score of 41–50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *DSM-IV* 34.

[5] The Beck Depression Inventory is a "self-report rating inventory that measures characteristic attitudes and symptoms of depression." Am. Psychological Ass'n, http://www.apa.org/pi/about/publications/caregivers/practice-settings/assessment/tools/beck-depression.aspx (last visited July 30, 2014).

self-reported symptoms. (R. 328.) Dr. Hagan decreased Cooke's dose of Effexor and discontinued his use of Wellbutrin and Prolixin. (R. 327-28.) Dr. Hagan diagnosed polysubstance abuse, schizophrenic disorder, and amnestic disorder, not otherwise specified. (R. 330.) She opined that his prognosis was good if he "remained sober from controlled substances." (*Id.*) On July 12, Dr. Hagan noted that Cooke's mood had stabilized, and she discharged him with instructions to follow-up with the community services board and his primary care provider. (R. 329.)

On July 19, 2010, Cooke complained to physician's assistant Branson of pain, fatigue, and depression, and he stated that medications did not help his depression. (R. 345.) Branson found that Cooke was pleasant, alert and oriented times three, and talkative and had an appropriate affect, appropriate speech, and good eye contact. (*Id.*) On August 19, Cooke told Branson that he had started taking Seroquel and that other than being tired, he felt good. (R. 347.) Branson noted normal psychological signs. (*Id.*) On September 22, Cooke complained of lower back pain and trouble urinating. (R. 350.) He did not complain of fatigue, and he reported walking and performing activities of daily living with no difficulty. (*Id.*) Branson found that Cooke had normal range of motion of the spine and normal gait, sensation, and strength. (*Id.*) Her psychological findings were normal. (*Id.*)

Psychiatrist William Trost, M.D., conducted an initial psychiatric evaluation of Cooke on August 13, 2010.[6] (R. 620-22.) Dr. Trost noted Cooke's prior hospitalizations, including two from the previous months, and several drug treatment program admissions. (R. 620-21.) He surmised that Cooke's condition was bipolar disorder rather than pure depression because it was

---

[6] The ALJ attributes these treatment notes to Dr. Don Tessman, M.D. (R. 21.) The request for records indeed was submitted to Dr. Tessman, and these treatment notes do indicate a date of January 5, 2011. (R. 441-42.) The notes, however, are identical to those of Dr. Trost dated August 13, 2011. (*Compare* R. 441-42, *with* R. 516-17, 620-22.)

7

marked by periods of elevated mood with euphoria followed by days of withdrawal and depression. (*Id.*) Cooke reported primary symptoms of depression and pain and stated that he spent most of his time in bed. (R. 621.) In his last job, Cooke worked for a friend who understood his limitations, but he was laid off during a downturn in the economy. (*Id.*) Cooke reported experiencing some auditory and visual hallucinations and some passive suicidal thoughts. (*Id.*) On mental status exam, Dr. Trost noted a constricted affect; depressed mood; appropriate, pleasant, and cooperative attitude; linear and goal directed thought processes; no gross deficit in memory; some difficulty in long term memory; and fair insight. (*Id.*) Dr. Trost diagnosed bipolar disorder, not otherwise specified, history of opiate dependence, and history of cocaine abuse, and he assigned a GAF score of 45 to 50. (R. 622.) He prescribed Seroquel, Gabapentin, and Cyclohezaprine. (R. 621.)

On September 7, 2010, Cooke reported improved symptoms, but still significant anxiety. (R. 620.) On November 2, Cooke reported irritability with his father. (R. 619.) Dr. Trost noted that Cooke showed no signs of mania or psychosis. (*Id.*) On December 28, Cooke reported increased depression and some passive thoughts of suicide. (R. 618-19.) Dr. Trost's mental status exam was normal other than findings of depressed mood and affect. (R. 619.) He noted concern over Cooke's "worsening mood" and "suicidality" and adjusted Cooke's medication. (*Id.*) A month later, Dr. Trost noted normal psychological findings, including euthymic mood, and found that Cooke's symptoms had substantially improved. (R. 618.) From month to month during March through October 2011, Cooke's depressive symptoms worsened and then improved with medication adjustment. (R. 613-17.) During this period, Dr. Trost determined that Cooke's "diagnostic picture is becoming clearer and looks increasingly like bipolar I with rapid cycling." (R. 615.)

8

While being treated by Dr. Trost, Cooke also received "cognitive behavioral psychotherapy, to help better manage pain, mood and stress" from Dr. Lora Baum, Ph.D., and Nurse Lara Myers, N.P., at the University of Virginia Pain Management Center. (R. 558.) Notes of Cooke's first appointment with Dr. Baum on October 6, 2010, chronicle Cooke's mental health history. (R. 561.) When Cooke was five years old, he was molested by an older cousin. At age 16, he began using heroin, cocaine, marijuana, and pills. In 2003, his mother died of lung cancer, and he attempted suicide by overdosing, after which he participated in extensive drug counseling. In 2008 he started a home improvement business. A downturn in the economy and an increase in Cooke's back pain caused him to abandon this business. In July 2010, he attempted suicide again by overdosing on heroin and cocaine. He is seeking disability because of his pain and depression. On mental status exam, Dr. Baum found that Cooke was depressed and anxious, but oriented. He had a labile affect, crying at times; intact thought process; good attention, judgment, insight, and thought control; decreased energy, concentration, and motivation; and anhedonia. (R. 559.) Cooke reported having panic attacks twice a month. (*Id.*) Dr. Baum diagnosed major depressive disorder, recurrent, moderate and panic disorder with agoraphobia. (R. 558.)

On October 29, 2010, Cooke reported pain in his neck, lower back, and right knee. (R. 460.) An MRI taken of Cooke's spine on October 22, 2010, had shown slight disc bulge at C5-C6 and C6-C7 without stenosis and mild degenerative facet arthropathy at L4-L5, but was otherwise normal. (R. 406-09.) Cooke stated that he tried to walk for 15 minutes a day, but sometimes the pain was so great that he could not walk the next day. (*Id.*) Dr. Baum encouraged him to continue walking and recommended that he engage in a relaxation technique. (R. 462.) Dr. Baum's mental status exam and diagnosis were largely consistent with her prior findings.

9

(*Id.*) She assigned a GAF score of 60[7] and noted that Cooke's highest GAF in the last year was 65. (*Id.*)

On November 9, 2010, Cooke complained of knee pain after falling, back pain, and left leg pain. (R. 465.) Nurse Myers found that Cooke had normal range of motion in his neck; decreased range of motion, swelling, and tenderness in his right knee; tenderness and pain in his cervical back; and decreased range of motion, tenderness, and pain in his lumbar back. (R. 466.) She prescribed Nexium, ibuprofen, and tizanidine and encouraged Cooke to increase his physical activity. (R. 466-67.)

On January 6, 2011, Cooke told Dr. Baum that he had pain in his neck, lower back, and right knee. (R. 447-49.) He stated that he tried walking a couple of times, but gave up because of pain. (R. 447.) She counseled him against using narcotic pain medications. (*Id.*) Cooke reported that he could not be around more than one or two people for more than a couple of minutes and that he had experienced three panic attacks a month. (R. 448.) On mental status exam, Dr. Baum reported findings consistent with prior exams. (*Id.*) Her diagnosis was unchanged, and she assigned a GAF score of 55. (R. 449.)

In April 2011, Patricia Bruner, Ph.D., a state agency psychologist, reviewed the medical records through March 22, 2011. (R. 110-20.) She determined that Cooke had an affective disorder and a substance abuse disorder that were severe. (R. 115.) She found that Cooke had marked limitations in the ability to understand, remember, and carry out detailed instructions and moderate limitations in the ability to maintain concentration, complete a normal workweek without interruption from psychological symptoms, perform at a consistent pace, and accept

---

[7] A GAF score of 51–60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV* 34.

10

instructions and respond appropriately to criticism from supervisors. (R. 119-20.) Cooke had no other significant mental limitation. (*Id.*)

On April 4, 2011, Dr. Lynn Kohan, M.D., assessed Cooke for a possible injection to treat his back pain. (R. 579-80.) Dr. Kohan declined to provide the injection and instead counseled Cooke on the importance of exercise, including aquatherapy. (R. 577-79.) She explained that Cooke may experience some increased pain upon initiating exercise, but that exercise would benefit him and would be unlikely to cause damage. (R. 577.) On June 6, 2011, Cooke reported to Dr. Kamaldeen Saldin, M.D., that he had been swimming 10 minutes and walking 15 minutes a day. (R. 585.) His analgesic regimen provided moderate pain relief. (*Id.*) In November 2011, Cooke complained of worsening pain that he described like being struck in the back with a rod with sharp needles, and he was given a branch block injection. (R. 623-26.) The procedure was intended to provide pain relief and assist the doctors in diagnosing the cause of Cooke's pain. (R. 631.)

On August 11, 2011, Dr. Trost completed an impairment questionnaire, stating that he had diagnosed Cooke with bipolar disorder and alcohol and cocaine abuse. (R. 594.) Dr. Trost listed Cooke's history, past hospitalizations, and primary symptoms. (R. 595-96.) He identified the following clinical findings in support of the diagnosis: poor memory, sleep disturbance, mood disturbance, emotional lability, substance dependence, recurrent panic attacks, paranoia or inappropriate suspiciousness, feelings of guilt/worthlessness, difficulty thinking or concentrating, suicidal ideation or attempts, social withdrawal or isolation, decreased energy, manic syndrome, intrusive recollections of traumatic events, generalized persistent anxiety, somatization unexplained by organic disturbance, and hostility and irritability. (R. 595.) Dr. Trost opined that Cooke had numerous marked and moderate functional limitations and that he was incapable of

11

tolerating even low stress work. (R. 597-600.) Ultimately, Dr. Trost opined that Cooke was not able to work. (R. 594.)

In a December 2011 letter to Cooke's attorney, Dr. Trost again opined that Cooke was disabled. (R. 610-11.) He recounted Cooke's history, symptoms, and diagnosis and stated that his mental status exams were consistent with the diagnosis. (*Id.*) Dr. Trost asserted that Cooke's drug abuse was secondary to his "mood disorder, specifically mania" and does not contribute to his disability. (R. 611.)

During assessments bookending his disability hearing on January 3, 2012, Cooke reported to Dr. Trost thoughts of suicide if his application for disability were not granted. (R. 612-13.) On January 23, 2012, three days after the ALJ denied Cooke's request for disability, Dr. Trost noted that Cooke was "hopeless, despondent and intermittently agitated." (R. 612.) He opined that Cooke was a high suicide risk. (*Id.*)

B.     *Claimant's Statements*

On November 22, 2010, Cooke reported that his daily routine consisted of drinking coffee, eating lunch, watching television, playing video games, reading, cleaning, doing laundry, napping, and taking medicine. (R. 253, 257.) He shopped once a week for one hour for groceries and clothes. (R. 256.) He stated that he used to fish, golf, and go out with friends daily, but that his impairments now prevent these activities. (R. 257.) His parents took him to church and medical appointments. (R. 226, 257.) He also indicated that his impairments caused memory and concentration problems and that he feared and did not like people. (R. 258-59.)

At the administrative hearing, Cooke testified that he last worked in October 2009 with a friend. (R. 42.) He collected unemployment until February 2011, certifying that he was "ready, willing, and able to work." (R. 43.) Cooke admitted to using cocaine and marijuana up until two

12

years ago as well as pain medications and heroin. (R. 41-42.) He claimed to have used heroin only a couple of times. (R. 42.) He experienced constant pain in his lower and upper back, neck, and joints that was exacerbated by activity. (R. 45-48.) His pain was not eased by medication, and it caused him to stay in bed two to three days a week. (R. 48-50.) Cooke testified that he had manic phases every one to one and a half months, and they lasted three to four days. (R. 52-53.) Cooke cited his actions that led to one of his hospitalizations as an example of a manic phase. (*See* R. 53.) Cooke testified that he daily experiences depression, suicidal thoughts, and social phobia. (R. 53-54.) He experiences visual hallucinations bimonthly. (R. 54.) He testified to limited daily activities that were mostly consistent with his prior statements.

## IV. Discussion

A.    *Treating Physician Rule*

Cooke argues that the ALJ erred by giving little weight to the opinion of Dr. Trost, a treating physician. (Pl. Br. 15.) An ALJ must consider and evaluate all opinions from "medically acceptable sources," such as doctors, in the case record. 20 C.F.R. §§ 404.1527, 416.927. In determining what weight to afford a doctor's opinion, the ALJ must consider all relevant factors, including whether the doctor examined the claimant, the relationship between the doctor and the claimant, the degree to which the opinion is supported or contradicted by other evidence in the record, and whether the doctor's opinion pertains to his area of specialty. *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005) (citing 20 C.F.R. § 404.1527).

Opinions from physicians who have treated the patient are generally afforded more weight because treating sources are "most able to provide a detailed longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *accord Hines v. Barnhart*, 453 F.3d 559, 563 (4th Cir. 2006).

13

An ALJ must give a treating source opinion "controlling weight" to the extent that the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and … not inconsistent with the other substantial evidence in the record." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Even when a treating source's opinion is less than "well-supported" by diagnostic techniques, it is still entitled to a measure of deference. *Tucker v. Astrue*, 897 F. Supp. 2d 448, 465 (S.D. W. Va. 2012) (citing Social Security Ruling 96-2p). However, an ALJ may reject a treating physician's opinion in whole or in part if there is "persuasive contrary evidence" in the record. *Hines*, 453 F.3d at 563 n.2; *Mastro*, 270 F.3d at 178; *Tucker*, 897 F. Supp. 2d at 465. When an ALJ gives less than controlling weight to a treating physician's opinion, the treating source rule requires him to specify how much weight he gives the opinion and offer "good reasons" for that decision. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

Noting that the issue of disability is reserved to the Commissioner, the ALJ rejected Dr. Trost's opinions that Cooke was "disabled." (R. 26.) *See* 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1); *Huff v. Astrue*, No. 6:09cv42, 2010 WL 5296842, at *5 (W.D. Va. Nov. 22, 2010); Social Security Ruling ("SSR") 96-5p, 1996 WL 374183. Cooke does not take issue with this decision. He does, however, take issue with the ALJ's decision to assign "little weight" to Dr. Trost's opinion concerning Cooke's specific limitations. The ALJ noted that Dr. Trost was a treating physician, but gave his opinion little weight, finding that it was inconsistent with the record and his own treatment notes. (R. 27.) Specifically, the ALJ found that Dr. Trost's records showed that Cooke's symptoms improved and at times he felt good. The ALJ cited records from other medical sources that reported Cooke was doing well, provided GAF scores of 55 to 60,

Case 4:13-cv-00018-JLK-JCH   Document 19   Filed 08/05/14   Page 14 of 23   Pageid#: 760

indicating moderate symptoms, and observed that in June 2010 Cooke "would not qualify for disability benefits in their opinion." (*Id.*) The ALJ also noted Cooke's activities of daily living.[8]

The most substantial reason given by the ALJ – that Dr. Trost's opinion conflicts with other evidence in the record – withstands scrutiny.

On Cooke's hospital admission in June 2010, he was diagnosed with depressive disorder and substance abuse disorder. Prior to his admission, he had been abusing cocaine. Mental status exams during his admission showed mostly normal findings. Upon discharge, Dr. Goli assigned Cooke GAF scores indicating mild symptoms. Days after his discharge, Cooke was admitted to another hospital. He admitted to using Percocet that he acquired illegally. After a week of treatment, Cooke was discharged in stable condition. The attending physician opined that Cooke's prognosis was good if he "remained sober from controlled substances." Both before and after these admissions, Cooke's primary care provider, physician's assistant Branson, conducted mental status exams of Cooke and reported normal findings. (R. 338, 343-44, 347, 350.) In August 2010, Cooke told Branson that since he began taking Seroquel, he felt good. (R. 347.)

Dr. Baum treated Cooke from October 2010 to January 2011. During this time, her mental status exams of Cooke generally showed signs of depression and anxiety and decreased energy, concentration, motivation, and interest. (R. 448, 462, 559.) Additionally, Cooke was oriented and had intact thought process and good attention, judgment, insight, and thought control. (*Id.*) Dr. Baum diagnosed major depressive disorder, recurrent, moderate and panic

_____

[8] Cooke also argues that the ALJ did not weigh all of the factors in assessing Dr. Trost's opinions as required by 20 C.F.R. §§ 404.1527 and 416.927. (Pl. Br. 19.) In his written opinion, the ALJ noted that Dr. Trost was a medical doctor, he provided a summary of Dr. Trost's findings that covered many months, and he discussed whether those findings were consistent with the record. (R. 20-21, 26-27.) Although the ALJ did not expressly state that Dr. Trost was a psychiatrist, I find that the discussion of Dr. Trost's opinion and findings was adequate under the regulations.

15

disorder. (R. 558.) She assigned GAF scores of 55 and 60, indicating moderate impairments. (R. 449, 462.)

These medical records confirm that Cooke suffered from mental impairments, but they do not support Dr. Trost's findings as to the severity of the symptoms of Cooke's mental impairments or the restrictions they cause. Rather, they show that Cooke's impairments caused mild to moderate limitations, as reflected in the ALJ's findings and determination of Cooke's RFC. (*See* R. 28.)

Cooke argues the ALJ placed too much weight on the GAF scores that showed mild to moderate impairments. (Pl. Br. 15-16.) The Diagnostic & Statistical Manual of Mental Disorders, Fifth Edition, ("DSM-V") dropped the GAF "for several reasons, including its lack of conceptual clarity (*i.e.*, including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice." Am. Psychological Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013). Because they "reflect judgments about the nature and severity of [a claimant's] impairments," GAF scores assigned by "medically acceptable sources" constitute "medical opinions" under the regulations. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). A GAF score, however, merely reflects a "snapshot of functioning at any given moment," *Powell v. Astrue*, 927 F. Supp. 2d 267, 273 (W.D.N.C. 2013), and may not be "indicative of [a claimant's] long term level of functioning," *Parker v. Astrue*, 664 F. Supp. 2d 544, 557 (D.S.C. 2009). For these reasons, GAF scores may be of limited value in determining whether a claimant is disabled. In this case, the GAF scores from other treating sources were consistent with their mental status exams and other findings of mild to moderate psychological signs. The ALJ discussed this evidence in his written opinion. (*See* R. 20-21, 27.)

16

Accordingly, the ALJ did not err in citing GAF scores from other treating sources as one inconsistency with Dr. Trost's findings.

Cooke argues that the ALJ "exaggerated" his activities of daily living. (R. 17.) The ALJ found that Cooke watched television, read, played video games, attended church weekly, visited with his nephews every two weeks, and shopped for groceries or clothes for one hour a week. (R. 27.) Additionally, Cooke could handle a bank account, balance a checkbook, and follow instructions. (*Id.*) Contrary to Cooke's argument, these findings accurately reflect his statements. (*See* R. 59, 256-58.) Even so, these activities are modest.

As courts both in this circuit and elsewhere have recognized, a claimant's ability to perform modest activities of daily living is not a reason to reject claims that impairments cause disabling limitations. *See, e.g.*, *Bartley v. Astrue*, No. 5:08cv089, 2009 WL 3712682, at *9 (W.D. Va. Nov. 3, 2009) (finding "cooking once per day, dusting once per week, shopping with assistance every two weeks, reading the newspaper, talking on the phone, [and] watching television" does not indicate an ability to work), *report and recommendation adopted*, 2009 WL 4155920 (W.D. Va. Nov. 24, 2009); *Thompson v. Sullivan*, 987 F.2d 1482, 1490 (10th Cir. 1993) ("The 'sporadic performance [of household tasks or work] does not establish that a person is capable of engaging in substantial gainful activity.'" (quoting *Frey v. Bowen*, 816 F.2d 508, 516-17 (10th Cir. 1987) (alterations in original))). A claimant's "ability to struggle through the activities of daily living does not mean that [he or] she can manage the requirements of a modern workplace." *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011). This is because daily activities differ from the requirements of gainful employment in several important respects. *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). A person has flexibility in scheduling his daily activities, can get help from other persons, and is not held to a minimum standard of

17

performance; by contrast, an employer expects an employee to perform tasks proficiently, independently, and in a timely manner. *Id.* Thus, Cooke's modest activities of daily living provide little support for the ALJ's rejection of Dr. Trost's opinion.

Cooke faults the ALJ for relying "exclusively on the opinions from the non-examining state agency medical consultant." (Pl. Br. 17.) The ALJ adopted the functional limitations cited by Dr. Bruner, and he cited other evidence in the record that he found supported those limitations. (R. 27.) This reliance was permissible: "the [opinion] of a non-examining physician can be relied upon when it is consistent with the record." *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984). Cooke also points out that at the time Dr. Bruner reviewed the medical evidence, she did not have all of Dr. Trost's treatment records. Clearly Dr. Bruner could not consider Dr. Trost's notes of treatment that occurred after her assessment in April 2011. But Dr. Bruner expressly considered Dr. Trost's treatment notes through March 22, 2011, that documented periods of Cooke's improved and worsening mood. (*See* R. 114.) The findings Dr. Trost made subsequent to Dr. Bruner's review continue to document these trends of Cooke's improved and worsening mood.  (*See* R. 612-16.) Thus, Dr. Bruner had an adequate picture of Cooke's impairments when she formulated her opinion.

Cooke accurately states that Dr. Trost's medical opinion as to what Cooke can and cannot do is supported by his treatment notes. Cooke also asserts that bipolar disorder, like other chronic impairments, is characterized by periods of improvement followed by worsening symptoms. (Pl. Br. 16.) Notwithstanding the reasonableness of this assertion, Dr. Trost's opinion, as noted above, is not supported by other parts of the record.

In determining whether a claimant is disabled under the Act, the Commissioner must weigh medical and other evidence. The Commissioner may determine that certain medical

18

evidence or opinions are entitled to more weight than others. As long as substantial evidence, which is defined as more than a scintilla, supports the Commissioner's decision, this Court must uphold it. The standard of review does not permit the Court to reweigh evidence or choose between competing medical findings or opinions. Those are tasks delegated to the Commissioner. If the Commissioner correctly applies the law and provides valid reasons, supported by substantial evidence, for crediting certain evidence or opinions over others, I must uphold her determinations. *See Gordon*, 725 F.2d at 235.

Although not every reason the ALJ gave for discounting Dr. Trost's opinion holds up, the ALJ nonetheless relied on medical evidence from acceptable medical sources in assessing the weight to accord Dr. Trost's opinion and in determining Cooke's RFC. Accordingly, I find that the ALJ's determinations are supported by substantial evidence.

B.   *Credibility*

Cooke argues that the ALJ improperly assessed his credibility.[9] (Pl. Br. 19, 22.) It is not this Court's role to determine whether Cooke was a credible witness. *See Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *see also Shively v. Heckler*, 739 F.3d 987, 989 (4th Cir. 1984). Rather, the Court must be satisfied that the ALJ applied the correct legal standard in evaluating Cooke's credibility and that substantial evidence supports his conclusion that Cooke's claims of impairment were not entirely credible. (R. 25.) *See Craig*, 76 F.3d at 589.

---

[9] Cooke correctly points out that the ALJ seems to have made a finding as to his RFC before assessing his credibility, reversing the analysis. (Pl. Br. 21.) In this case, however, explaining these findings out of sequence does not undermine the ALJ's decision. The ALJ thoroughly addressed Cooke's credibility and provided a rationale for his determination that is, on the whole, supported by substantial evidence. Thus, I agree with my colleagues that while the ALJ's order of analysis is "unfortunate," it does not warrant reversal. *See, e.g., Martin v. Colvin*, No. 5:12cv66, 2013 WL 4451230, at *7 (W.D. Va. Aug. 16, 2013); *Racey v Astrue*, No. 5:12cv36, 2013 WL 589223, at *6 (W.D. Va. Feb. 13, 2013).

19

ALJs follow a two-step process for evaluating an applicant's statements about his symptoms. *See* 20 C.F.R §§ 404.1529, 416.929; Soc. Sec. R. 96-7p, 1996 WL 374186 (Jul. 2, 1996). First, the ALJ must "consider whether there is an underlying medically determinable physical or mental impairment . . . that could reasonably be expected to produce" the claimant's alleged symptoms. Soc. Sec. R. 96-7p, 1996 WL 374186, at *2; *accord Hines*, 453 F.3d at 565. If there is, the ALJ "must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which [they] limit [his] ability to do basic work activities." *Id.* Whenever the claimant's symptoms are "not substantiated by objective medical evidence," the ALJ "must make a finding on the credibility of the individual's statements" in light of the entire record. *Id.*; *see also Craig*, 76 F.3d at 595 (noting that an evaluation of the intensity and persistence of a claimant's pain and the extent to which his pain affects his ability to work must take into account a claimant's subjective statements as well as all the available evidence, including medical history and objective evidence) (citing 20 C.F.R. §§ 404.1529(c)(1)-(2),416.929(c)(1)-(2)). The ALJ must give specific reasons for the weight given to the claimant's statements, Soc. Sec. R. 96-7p, 1996 WL 374186, at *2, and those reasons must be supported by substantial evidence in the record, *see Craig*, 76 F.3d at 589.

For three pages of his written opinion, the ALJ detailed Cooke's testimony about his activities of daily living and his claims of disabling pain and depression. (R. 23-26.) The ALJ concluded that Cooke's claims of impairment were not credible to the extent claimed, finding inconsistencies between Cooke's testimony and other evidence in the record, including diagnostic tests showing only mild degenerative changes of his spine, his receipt of unemployment benefits through early 2011, statements of more extensive past drug use, treatment records that indicated improved mental conditions with medication, absence of

notations of manic behavior, reports of more extensive activities of daily living, and reports of self-employment. (R. 26.)

Cooke faults the ALJ for relying on his inconsistent statements about his past drug use and work history as well as his pursuit of unemployment benefits while simultaneously applying for disability. The ALJ correctly noted that Cooke minimized his past heroin use. He also correctly noted Cooke's inconsistent statements about his past work. Cooke usually stated that he worked for a friend and was laid off in part because of the economic downturn and in part because of his impairments. (*See, e.g.,* R. 42, 621.) However, he also variously claimed to have operated his own business (R. 561) and to have been fired for arguing with his boss (R. 216). The ALJ also properly considered Cooke's contradictory statements that he was capable of working so that he may receive unemployment benefits while he simultaneously claimed to be disabled for purposes of his disability application. *See Mabe v. Colvin*, No. 4:12cv00052, 2013 WL 6055239 (W.D. Va. Nov. 15, 2003).

Had the ALJ solely relied on Cooke's collection of unemployment benefits or his marginally inaccurate statements about his past work and history of drug abuse, the credibility determination would be debatable. In discrediting a claimant's subjective account of his or her symptoms, an ALJ may not rely solely on irrelevant inconsistencies between the claimant's statements and other evidence in the record. *Cf. Chen v. INS*, 266 F.3d 1094, 1098 (9th Cir. 2004) (noting, in the context of asylum determinations, that "[a]dverse credibility determinations based on minor discrepancies, inconsistencies, or omissions that do not go to the heart of [a case] cannot constitute substantial evidence"), quoted approvingly in *Dankam v. Gonzalez*, 495 F.3d 113, 122 (4th Cir. 2007). The ALJ's credibility assessment, however, had more substance than that. He accurately noted that Cooke's claims of extreme, debilitating back and neck pain found

21

no support in the medical records, which revealed only mild objective findings and very conservative treatment.

It is proper for an ALJ to consider a claimant's statements about the severity of his or her physical impairments and whether they are credible in assessing the claimant's claims of the severity of his mental impairments. A claimant's propensity to exaggerate claims of impairment for some conditions may be probative of his credibility regarding other conditions. The ALJ properly determined that Cooke's claims of debilitating pain were not supported by other evidence in the record. (R. 25.) Notably, diagnostic tests showed only mild degenerative changes in his spine. Although Cooke's mental symptoms find more support in the record, the ALJ properly found that Cooke tended to exaggerate these symptoms as well.

The ALJ noted Cooke's inconsistent statements about his mental symptoms. (R. 26.) At the administrative hearing Cooke testified that even while on medications he experienced manic episodes, like those that lead to his two hospitalizations in 2010, about once a month that lasted for three days. (R. 52-53.) The record does not support this claim. Rather, the treatment notes show that Cooke experienced two such episodes, both while he was either not using psychiatric medication or that medication had not yet become effective. The treatment notes further show that doctors attributed both episodes in large part to his abuse of illegal drugs.

While some of the ALJ's rationale, such as Cooke's supposed inconsistent statements about his activities of daily living, may be questionable, on this record, I cannot find fault with the ALJ's decision also to discount the reliability of Cooke's claims of disabling mental symptoms.

## V. Conclusion

For the foregoing reasons, I respectfully recommend that the Commissioner's motion for summary judgment (ECF No. 16) be granted, Cooke's motion for summary judgment (ECF No. 10) be denied, and the Commissioner's final decision be affirmed.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: August 5, 2014

Joel C. Hoppe
United States Magistrate Judge

23